UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SPRAGUE ENERGY CORP.,                    :
                                         :
        Plaintiff,                       :
                                         :
        v.                               :      CASE NO. 3:09CV29(RNC)
                                         :
LEVCO TECH INC., ET AL.,                 :
                                         :
        Defendants.                      :

                RULING ON MOTION FOR PREJUDGMENT REMEDY

     The plaintiff, Sprague Energy Corporation[1], brings this
diversity action against Levco Tech Inc. ("Levco"), its former
customer, for breach of contract.  The plaintiff also sues members
of the Levene family[2], who own Levco and executed personal
guaranties of its obligations.

     The plaintiff filed a Motion for Prejudgment Remedy, doc. #4,
seeking an attachment of $7,770,458.70 against Levco and the
individual defendants.  After a four-day evidentiary hearing, the
court granted the plaintiff's motion on April 20, 2009.  The court
now sets forth its findings of fact and conclusions of law in
support of that ruling.

_____

        [1]After Sprague filed this action, the defendants filed a
countersuit.  The two cases have been consolidated.  The court
refers to Sprague as the plaintiff and to Levco and the Levenes as
the defendants.

        [2]The individual defendants are Sally Levene and her sons,
Edward, Robert and Philip Levene.  Also named as a defendant is
Doris Levene, Robert Levene's wife.

                                    1

I.   **Factual Findings**

Based on the evidence presented at the hearing, the court makes the following findings of fact.

A.   Sprague Energy Corporation

Sprague is a wholesale supplier of petroleum products, including home heating oil.  It operates terminals throughout New England, including one in Stamford, Connecticut, where customers can "lift," or pick up, heating oil.

Some of Sprague's customers purchase oil at "rack prices," meaning that they simply send trucks to purchase oil at a rate set daily by Sprague, much like customers buying gasoline at a gas station.  Other customers, including Levco, choose to enter into contracts, known as "forward contracts," whereby the customer agrees to purchase home heating oil to be delivered in the future. Sprague offers several different types of forward contracts.

One type of forward contract is a "fixed forward" contract, in which the customer agrees to purchase a certain volume of oil, to be lifted in a particular month in the future.  The pricing for a fixed forward contract consists of two elements, the market price of the oil at the time the contract is made, plus Sprague's "sales differential."  The sales differential, which is set at the time the contract is entered into, includes Sprague's overhead, such as transportation costs and pipeline costs, as well as Sprague's profit margin.  The customer's price is set on the day the parties enter into the contract, regardless of whether the market price

2

goes up or down prior to the date of delivery.  As with all Sprague contracts, payment is due shortly after the oil is lifted.

Another type of forward contract Sprague offers is the Unpriced Guaranteed Differential ("UGD") contract.  It is slightly different from a fixed forward.   In a UGD contract, the sales differential is fixed as of the date the contract is entered into, but the other pricing component, the price of the oil, is not.  Rather, the customer may watch the market price of heating oil and decide when to "price" the contract.

Sprague determines the market price of oil based on the New York Mercantile Exchange (NYMEX) price index for home heating oil futures.  NYMEX is a commodity futures exchange.  The plaintiff monitors a live-time reporting service that tracks the current price of heating oil futures on the NYMEX exchange.[3]  Customers of Sprague who are deciding whether to price their contracts can, and do, call to find out the current price.

The price of oil fluctuates daily.  Because forward contracts set a price for oil before it is actually delivered, both seller and buyer face risks associated with changing prices.  For example, if the customer prices its oil in the summer, in the belief that prices are likely to go up as winter approaches, and prices in fact go down, the customer will have committed to buying oil at a price higher than the actual market price at the time of delivery.

---

[3]Levco subscribes to a similar service, but with a thirty-minute delay.

Sprague offers at least one program, called a Downside Protection program, to help its customers reduce their risk.  Under that program, the customer is charged an additional premium for protection against price changes– an opportunity to re-price the contract before delivery if the market price declines.  Another way that customers can manage their risk is by entering into fixed-price contracts with their own customers, so that homeowners pay a set price even if the market price subsequently changes.

Sprague faces its own risks based on market volatility.  To ensure a supply for its customers, Sprague purchases oil from a number of sources at prices that vary with the market.  If prices go up after a contract is priced, Sprague is committed to supplying oil at a price lower than the market price at the time delivery is due.  Another risk Sprague faces is a customer failing to lift oil.  In that event, Sprague can sell the oil to other customers, but if the market price at the time of resale is lower than the contract price, then Sprague suffers a loss as compared to the price it would have received under the contract.

In order to manage some of its risk, Sprague buys futures contracts on the NYMEX market.  A futures contract, generally speaking, is an agreement to buy or sell a quantity of a commodity at a set price at or before a given time in the future.  Most futures contracts are traded on a commodities exchange market with the understanding that they will be liquidated before physical

delivery is due.[4]

Hedging is part of Sprague's overall risk management program. When a customer buys a fixed forward contract or prices a UGD, Sprague purchases an equivalent heating oil futures contract on the NYMEX through its broker.  Purchasing futures contracts offsets, or "hedges," the risk associated with market price volatility.  If the price of oil goes up, Sprague takes a loss in supplying its customer, but it has also made an equivalent gain on the futures market.  Hedging ensures that Sprague can count on its sales differential, which includes a profit margin and Sprague's overhead, regardless of whether prices go up or down.  Sprague has margin payment obligations associated with futures purchases.

Although Sprague purchases futures contracts at the same time that it enters into contracts with its customers, once purchased the futures are not associated with any particular account.

B.   Sprague's Dealings with Levco

Defendant Levco is a home heating oil distributor in Stamford, Connecticut.  Its officers are members of the Levene family—brothers Edward Levene, Robert Levene, Philip Levene and their mother, Sally Levene.[5]   The company currently has 40 employees and

---

[4]The nature of a futures contract is discussed in more detail *infra*.

[5]Although Sally Levene testified that her involvement in the company has decreased in recent years, she remains the president of the company and continues to be involved in major corporate decisions.

3700 customers.  Levco began purchasing heating oil from the plaintiff in the mid-1990s.  Since at least 2001, Levco has purchased oil from Sprague through forward contracts.  Levco bought large volumes of oil in the spring or summer, when prices were low, and sold it to household customers in the fall and winter, when oil prices usually were higher.[6]  Philip Levene had primary responsibility for purchasing oil.

At the hearing, Levco attempted to portray itself as a small, naive and unsophisticated family business.  The court does not credit this line of testimony and finds that Levco and the Levenes were experienced oil buyers well aware of the risks associated with oil price volatility.  Levco is one of Sprague's biggest customers in Connecticut, typically purchasing as much as six million gallons a year.  Levco bought oil through UGDs and fixed forward contracts for years and was successful and profitable in that period, with each of the brothers taking annual salaries of as much as $300,000.

In 2000 or 2001, the Sprague terminal in Stamford faced supply problems because certain barges refused to deliver oil during bad weather.  A Sprague sales representative, Kevin McKenna, told Philip Levene that if supply ran low, Sprague would give preference to customers with contracts over rack customers.  These supply problems were subsequently resolved when the plaintiff contracted

---

[6]The court does not find credible Philip Levene's testimony that Levco followed this summer pricing strategy, without regard to the risk of oil price fluctuations or other business considerations, merely because Sprague's salesman, Kevin McKenna, recommended it.

with a new barge company.  There is no evidence that the defendants
ever asked Sprague about the status of the supply issues, and the
court does not find credible Levco's suggestion that the supply
issue was the primary motivating factor in its decision to continue
buying oil by contract rather than from the rack.

Levco did not have any strategy in place for managing the risk
that the market price might go down.[7]  It never expressed any
interest in Sprague's risk reduction options such as the Downside
Protection program, and it rarely entered into fixed-price
contracts with its own customers.  To the contrary, Levco sent its
customers letters advising them that historic trends showed that a
variable rate contract would usually be better for household oil
buyers.  Sprague was unaware that Levco did not have fixed price
contracts with its residential customers.

Sprague required that Levco enter into a Master Distillate
Agreement in order to purchase oil through forward contracts.
Several such agreements were executed over the years, but the most
recent one (the "Master Agreement") is dated August 2007.  The
Master Agreement provides general terms for the parties'
relationship.  In addition, each time it contracted for oil
delivery, Levco signed a "Sales Confirmation" setting forth the
pricing and delivery terms and incorporating the terms of the

---

[7]Based on Philip Levene's entire testimony, the court is
persuaded that Levco knew of the risks involved in its oil
purchasing strategy and speculated that the price of oil would go
up every fall, increasing Levco's profit.  This strategy was
successful for many years.

Master Agreement.  As further discussed below, the Master Agreement includes, among other things, a termination clause with a liquidated damages provision.

Over the years, Levco's credit line with Sprague increased. As of 2006, it was $250,000.  By January 2008, the credit line was $1 million.  In April or May 2008, because of the sharp rise in heating oil prices, Sprague increased the credit lines of about 400 of its customers.  Sprague increased Levco's credit line to $1.4 million at this time and informed Levco of the increase.

C.   The Levenes' Personal Guaranties

On December 3, 1996, Sally, Edward, Philip and Robert Levene (the "Guarantors") signed a personal guaranty under which they "jointly and severally" guaranteed "the due fulfillment to Sprague Energy Corp . . . of all obligations of Levco . . . . to Sprague Energy, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising."   (Pl's Ex. 2.) Under the 1996 personal guaranty, the Guarantors waived notice of any loan made or credit advanced.  The guaranty does not include a termination date or any termination provision.

In 2003, Sprague requested updated financial information from all four Guarantors.  Defendants Robert Levene, Philip Levene and Edward Levene provided the information, but Sally Levene did not.[8]

---

[8]Although Sprague prefers to have updated personal financial information about guarantors, it relies on personal guaranties in the absence of financial information when the guarantor is a principal or president of a company.

In 2005, the plaintiff requested new guaranties from all four Guarantors because of a new internal policy requiring that guaranty agreements be notarized.  Defendants Robert, Philip and Edward Levene signed new guaranty agreements[9], and on August 22, 2005, Philip Levene sent a letter to Sprague's credit department, stating "As you requested, I am returning the updated personal guarantees for myself and my two brothers."   (Pl's exs. 3-5; defs' ex. 35.) The letter did not mention Sally Levene, the president of the company.  Sally Levene did not submit a new guaranty in 2005. However, neither did she communicate to Sprague that she intended to revoke or terminate her 1996 guaranty.[10]

    Prior to the alleged breach of contract in 2008, Sally Levene never gave any notice of revocation to Sprague.  Although individual Sprague witnesses at the hearing were not specifically aware of the 1996 guaranty prior to the 2008 contract breach, the company as a whole relied on it in continuing to extend credit to Levco.

    D.   <u>2008 Contracts</u>

    In the spring of 2008, Levco purchased over four million

_____

[9]The guaranties signed by the three brothers in 2005 are identical to the 1996 guaranty.  The only difference is that they are notarized, while the 1996 guaranty was merely witnessed.

[10]The court does not find credible the testimony of Philip Levene that he told one of plaintiff's employees in either 2003 or 2005 that only he and his brothers would submit new guaranties because his mother was backing out of the business.  There is no evidence of such a conversation other than his own testimony. However, as further discussed *infra*, even if this conversation did take place, it did not constitute effective notice of termination.

gallons of heating oil from Sprague for delivery in the 2008-09 heating season.  All of its purchases were through UGDs and fixed forward contracts.  Levco priced some of the UGDs in May and some in August, with contract prices generally between $3 and $4 per gallon.  (See Pl's ex. 19.)  The volume was somewhat smaller than in previous years, but otherwise Levco's purchases were not unusual.

In the fall of 2008, the price of oil declined significantly. As a result, the contracts Levco had purchased (like those of many other Sprague customers) were increasingly "underwater," meaning that the contract price Levco had agreed to pay Sprague was far higher than the market price at which Levco could sell the oil to its own customers.  Sprague, whose employees generate daily reports tracking the difference between each customer's contract price and market price, was aware of the deteriorating situation of many of its customers' contracts.  Sprague was not concerned about Levco because it was a large customer with a good record of paying its invoices on time.

In October 2008, realizing that many customer contracts were badly underwater, the plaintiff offered a buyback program to all of its customers.  For a penalty equaling the difference between the customer's contract price and the current market price, the customer could terminate any contract with no further obligation. The penalty would be paid back in three installments.  Although Levco took advantage of this offer, it sold back only 84,000

10

gallons of oil.  Pursuant to the buyback agreement, Levco agreed to
pay Sprague a total of $117,318.60 in three installments of
$39,106.20 payable on November 21, 2008, December 21, 2008 and
January 20, 2009.  (Pl's Ex. 6.)

    E.   <u>Levco's Breach</u>

In early November 2008, Levco failed to lift oil as required
by its contracts.  It did, however, lift oil from the rack (at a
lower price than its contract price) throughout November.  On
November 7, 2008, defendant Edward Levene contacted Sprague and
requested a meeting.  He refused to say anything about the subject
matter of the meeting and asked that it be held at a hotel in
Greenwich.  This unusual request was Sprague's first cause for
concern.  The meeting was held on November 10, 2008, and two
subsequent meetings were held on November 14 and 24.  At the last
meeting, Robert Levene informed Sprague that Levco would not lift
the oil it had agreed to lift under its contracts.  Levco did not
make the November 21, 2008 payment due under the buyback agreement.

Section 13 of the Master Agreement between Levco and Sprague,
titled "Non-Defaulting Party's Rights," governs termination of the
contract and also includes a liquidated damages provision.  (Pl's
Ex. 1, ¶13.)  It provides that when an "Event of Default" occurs,
the non-defaulting party may terminate the contract.[11]  An Event of

---

[11]Failure to lift oil, by itself, is not an Event of Default
as that term is defined in the contract.  Section 11(c) of the
contract provides for monetary remedies in case of a failure to
lift, but it does not say that Sprague can terminate the Master
Agreement based solely on failure to lift.

Default occurs, *inter alia*, when a party fails to perform its "Adequate Assurance" obligations under Section 17.  (Pl's Ex. 1, ¶12.)  Section 17 provides that if Sprague has "reasonable grounds for insecurity regarding [Levco's] performance of any obligation under this Agreement," Sprague may demand "adequate assurance of performance, meaning sufficient security in the form, amount and for the term reasonably acceptable to Sprague."  (Pl's Ex. 1, ¶17.) Such adequate assurance may include, at Sprague's discretion, a standby irrevocable letter of credit, a prepayment, a security interest in an asset, or a performance bond.  (Id.)

If an Event of Default occurs, the non-defaulting party is entitled to a "Net Settlement Amount," which is a sum of liquidated damages equal to (1) any amount owed for product lifted and not paid for as of the termination date plus (2) any positive difference between the contract price for product remaining to be purchased under the applicable Sales Confirmations and the market value of that product.  Pursuant to Section 13, "the Non-Defaulting Party shall give notice to the Defaulting Party of the 'Early Termination Date'" and shall calculate the Net Settlement Amount. For purposes of calculating the Net Settlement Amount, the non-defaulting party is required to calculate the market value of the unlifted oil "in a commercially reasonable manner" but may consider, "among other valuations," the applicable NYMEX settlement prices, similar sales or purchases, and any *bona fide* third party offers, "all adjusted for the length of the term and differences in

transportation costs."

On December 10, 2008, the plaintiff sent Levco a letter stating that Sprague had reasonable grounds for insecurity regarding Levco's ability to meet its payment obligations. Pursuant to Section 17 of the Master Agreement, Sprague requested adequate assurance in the form of a deposit in the amount of $1.5 million by December 11, 2008.  (Pl's Ex. 7.)  Sprague had reasonable grounds for insecurity when it sent this request. Sprague also sent letters to each of the Guarantors demanding payment in full of $39,106.20, the amount due on Levco's then-overdue invoices.  (Pl's Exs. 8-11.)   Neither Levco nor the Guarantors made the requested payments.

By letter dated December 30, 2008, Sprague notified the defendants that, effective January 6, 2009, it was terminating the Master Agreement pursuant to Section 13 because of Levco's failure to make timely payment and provide adequate assurance.  (Pl's Ex. 13.)

On January 6, 2009, the plaintiff notified Levco that it had terminated the Master Agreement and all pending transactions. (Pl's Ex. 14.)  The plaintiff's letter also advised the defendants that the Net Settlement Amount, as defined in the Master Agreement, was $7,770,458.70[12], payable by close of business January 8, 2009. (Id.)  The defendants did not make any payment at that time or at

---

[12]As noted in an attachment to the letter, this sum did not include the third payment for the October buyback agreement because that payment was not yet due.  (Id.)

13

any time since.

Although it had terminated the contract, Sprague still hoped that it could reach an agreement with Levco. It therefore waited until January 16, 2009 before liquidating 97 futures contracts out of its pool, which amounts to roughly 4 million gallons' worth of oil- the amount of oil in the defendants' breached forward contracts. The futures contracts that were liquidated did not necessarily correspond to the delivery dates for Levco's breached forward contracts, as there is no way to trace the futures contracts that were purchased specifically to hedge Levco's purchases.

To prove its damages at the hearing, the plaintiff offered a summary, Pl's Ex. 19, which lists each contract, the contract price, and the market price Sprague applied in calculating the Net Settlement Amount. The plaintiff's witness, David Daoust, explained the significance of each column and explained how Sprague derived the market price.[13] Based on this chart, the total difference between the contract price and market price is $7,621,977.50. In addition, Sprague also claims damages for certain past due invoices and for payments due toward the October buyback. Sprague's motion for prejudgment remedy seeks attachment

_____

[13]He explained that, because the termination occurred in January, there was no longer a current NYMEX price for any oil that was supposed to be lifted between October and January. Therefore, the plaintiff applied the then-current February NYMEX price. For oil that would have been lifted in February through May, the plaintiff applied the prices at which futures for those months were then being traded on the NYMEX.

14

in the amount of $7,770,458.70.[14]

     F.   <u>Misuse of the Term "Futures Contract"</u>

     Levco's witnesses testified that they believed Levco was buying futures contracts from Sprague rather than buying oil to be delivered in the future.  The court does not credit this testimony. For several years, Levco entered into contracts in the summer for delivery of oil the following winter, and every winter the oil was delivered.  There was never any indication that Levco could sell its contracts on an exchange.

     Levco elicited testimony that people in the heating oil industry, including some of plaintiff's customers, sometimes refer to forward contracts– contracts for future delivery of oil– as "futures contracts."  Employees of the plaintiff have on occasion misused the term "futures contract" in both conversation and correspondence.  The plaintiff has held training for its employees about the importance of using the accurate term, but employees were not instructed to correct customers who mistakenly referred to forward contracts as futures contracts.  Despite misuse of the term, people in the industry are not generally confused about the actual nature of what they are purchasing.

_____

[14]The plaintiff's post-hearing memorandum (doc. #76) includes an attachment summarizing its total damages as slightly more than $7.8 million.  That sum is $39,106.20 higher than the amount it seeks in its motion for prejudgment remedy, apparently because it previously neglected to include the third installment for the October buyback agreement.  Although the plaintiff appears to have noticed this oversight when it prepared its post-hearing papers, its memorandum still seeks the lower amount, consistent with its original motion. (<u>See</u> doc. #76 at 40.)

There is no credible evidence that the defendants actually believed they were investing in futures to be traded on a commodities exchange market, rather than entering into contracts for the actual delivery of oil.  Other than the occasional misuse of terminology, which is common in the industry, there was nothing about Levco's transactions with Sprague that would lead a reasonable layperson, much less an experienced businessperson with a decade or more of experience in the oil industry, to believe that Levco was buying anything other than oil.

## II.   **Choice of Law**

Before turning to the analysis of the parties' claims, the court must address the law that governs the plaintiff's motion. The parties agree that New Hampshire law governs the Master Agreement.[15]  They disagree, however, as to which state's prejudgment remedy standard should be applied.  The plaintiff's motion is brought under Connecticut's prejudgment remedy statute. The defendants argue, however, that the court should apply New Hampshire's prejudgment remedy statute, which requires a higher showing than Connecticut's statute.

Fed. R. Civ. P. 64, which governs prejudgment remedies, provides that "every remedy is available that, *under the law of the state where the court is located*, provides for seizing a person or

_____

[15]Section 29 of the Master Agreement provides in relevant part that "This Agreement and any Sales Confirmation shall be governed by and interpreted in accordance with the laws of the State of New Hampshire."

16

property to secure satisfaction of the potential judgment."
(emphasis added).

The plaintiff relies on the prejudgment remedy statute in
Connecticut, the "state where the court is located."  The
defendants argue that a Connecticut court, applying Connecticut's
choice of law rules, would apply New Hampshire's prejudgment remedy
statute[16], and therefore this court must do the same.

There is a dearth of authority on this issue, but the plain
language of Rule 64 does not support the defendants' reading.  The
rule refers solely to remedies available under the law of the forum
state.  The defendants have not cited any cases from this circuit
in support of their contention.[17]  The plaintiff, by contrast, cites

---

[16]The defendants do not cite any appellate law from
Connecticut in support of this choice of law argument.  They cite
one trial court case, <u>Macrolease Int'l v. Nemeth</u>, No.
CV990364471S, 2000 WL 804652 (Conn. Super. June 9, 2000), which
applied a contractual choice of law provision in using New York's
prejudgment remedy statute rather than Connecticut's.  The
plaintiff, however, cites another trial court case in which the
court refused to apply Massachusetts' prejudgment remedy statute
even though Massachusetts law governed the parties' substantive
claims.  <u>Butova v. Bielonko</u>, No. CV075010057, 2007 WL 4305534
(Conn. Super. Nov. 7, 2007).  Neither of these cases is
particularly persuasive as to what Connecticut law requires, and
neither appears to have been followed by other courts.

[17]The defendants cite two cases from outside this circuit in
support of their argument.  <u>See</u> <u>9911 Properties v. National
Property Analysis, Inc.</u>, No. 90-2832, 1990 WL 187041 (E.D. Pa.
Nov. 27, 1990); <u>S&G Press v. Harris Graphics Corp.</u>, 718 F. Supp.
1459 (N.D. Cal. 1989).  In both of these cases, the courts noted
that the forum state permitted parties to a contract to specify
their choice of law.  Neither case includes any analysis or
explanation as to why Rule 64 should be given a broader reading
than its plain language would suggest.  Moreover, based on the
court's research, these cases appear to stand alone among federal
court cases, and the court is not persuaded by their analysis.

several cases in this district which, while not addressing the issue directly, apply the forum state's prejudgment remedy statute despite the obvious applicability of a contractual choice of law provision to the parties' substantive claims.  <u>Bergen v. Magnus Lindholm</u>, 760 F. Supp 976 (D. Conn. 1991); <u>Darrah-Wantz v. Brown</u>, 138 F.R.D. 20 (D. Conn. 1991); <u>Capuano v. Island Computer Products, Inc.</u>, 382 F. Supp. 2d 326 (D. Conn. 2005).

The plain language of the rule, as well as the lack of authority supporting the defendants' view, leads the court to conclude that Connecticut's prejudgment remedy statute governs pursuant to Fed. R. Civ. P. 64.

**III.** **<u>Standard of Review</u>**

To prevail on its application for prejudgment remedy, the plaintiff must demonstrate that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in a greater amount, taking into account all known defenses, counterclaims and setoffs, will be rendered in such matter in favor of them.  Conn. Gen. Stat. § 52-278c. <u>See also</u> <u>Cahaly v. Benistar Property Exchange Trust Co.</u>, 73 Conn. App. 267, 278 (2002), rev'd on other grounds, 268 Conn. 264 (2004).  The burden of proof is a showing of probable cause, which "is a *bona fide* belief in the existence of the facts essential under the law for the action and such as would warrant a [person] of ordinary caution, prudence and judgment, under the circumstances, in entertaining it ... Probable cause is a flexible common sense standard. It does not demand that

18

a belief be correct or more likely true than false." <u>Cahaly</u>, 73
Conn. App. at 278 (internal citation and quotation marks omitted).

"[P]rejudgment remedy proceedings are not involved with the
adjudication of the merits of the action brought by the plaintiff
or with the progress or result of that adjudication. They are only
concerned with whether and to what extent the plaintiff is entitled
to have property of the defendant held in the custody of the law
pending adjudication of the merits of that action." <u>Marlin Broad.,</u>
<u>LLC v. Law Office of Kent Avery, LLC</u>, 101 Conn. App. 638, 646
(Conn. App. Ct. 2007)(quoting <u>Cahaly</u>, 73 Conn. App. at 273).

"The purpose of a prejudgment remedy of attachment is security
for the satisfaction of the plaintiff's judgment, should he obtain
one . . . It is primarily designed to forestall any dissipation of
assets by the defendant and to bring [those assets] into the
custody of the law to be held as security for the satisfaction of
such judgment as the plaintiff *may recover* . . . The adjudication
made by the court on [an] application for a prejudgment remedy is
not part of the proceedings ultimately to decide the validity and
merits of the plaintiff's cause of action. It is independent of and
collateral thereto . . . " <u>Id.</u> at 646-47 (emphasis in original)
(internal citation and quotation marks omitted).

## IV. **Discussion**

The court now turns to the plaintiff's substantive claims.
The plaintiff alleges that Levco breached the Master Agreement and
that Sally, Robert, Edward and Philip Levene (the "Guarantors")

breached their personal guaranties.  The plaintiff seeks to collect liquidated damages under the Master Agreement.[18]  The plaintiff seeks a prejudgment remedy from both Levco and the Guarantors.

The defendants argue that the Master Agreement is void and, even if it is enforceable, its liquidated damages provision is not enforceable.  They also argue that the plaintiff has miscalculated the damages due under that provision.  Finally, the defendants argue that the personal guaranties are not enforceable or, in the alternative, are limited to Levco's credit line.

A.   Breach of Contract Claim Against Levco

The plaintiff alleges that Levco breached its obligations under the Master Agreement.[19]  "A breach of contract occurs when there is a failure without legal excuse[] to perform any promise which forms the whole or part of a contract."  Lassonde v. Stanton, 157 N.H. 582, 588 (N.H. 2008).

The parties do not dispute the existence of a contract consisting of the Master Agreement and the incorporated Sales Confirmations.  It is undisputed that Levco failed to lift oil

---

[18]The plaintiff's complaint also includes fraudulent conveyance claims against Robert Levene and his wife Doris Levene, based on Robert Levene's alleged transfer of his interest in their house to his wife in October 2008.  The house has since been transferred back to a joint tenancy.  The plaintiff originally sought a prejudgment remedy against Doris Levene, but appears to have abandoned this claim, as there was no evidence about her involvement at the hearing and no argument about it in the plaintiff's post-hearing brief.

[19]As discussed supra, the parties agree that New Hampshire law applies to the substantive terms of the Master Agreement by virtue of a choice of law provision in the contract.

starting in November 2008.  Levco also did not make any payment pursuant to Sprague's adequate assurance demand, an Event of Default under the Master Agreement.  Rather than contesting whether there is a breach, the defendants instead argue that the contract in its entirety is unenforceable, or, in the alternative, that its liquidated damages provision is unenforceable.

1.   Enforceability of the Contract

As their primary defense to the plaintiff's claims, the defendants contend that Sprague did not sell Levco oil for future delivery, but rather sold Levco futures contracts.  They contend that, because Sprague is not a licensed broker under the Commodity Exchange Act that governs the sale of futures contracts, the parties' contract is illegal and voidable.

This claim is baseless.  Forward contracts involve "sale for deferred delivery.  A futures contract, by contrast, does not involve a sale of the commodity at all. It involves a sale of the contract." CFTC v. Erskine, 512 F.3d 309, 323-324 (6th Cir. 2008)(internal citations and quotation marks omitted).  A futures contract is standardized so that it can be traded on an exchange, and is a fungible agreement to buy or sell a stated unit quantity of a stated commodity at a stated unit price at or before a stated future time.  Id.  In a futures market, trade is "in the contract." CFTC v. Zelener, 373 F.3d 861, 865 (7th Cir. 2004).

> In organized futures markets, people buy and sell
> contracts, not commodities. Terms are standardized,
> and each party's obligation runs to an intermediary,

21

the clearing corporation. Clearing houses eliminate
counterparty credit risk. Standard terms and an
absence of counterparty-specific risk make the
contracts fungible, which in turn makes it possible to
close a position by buying an offsetting contract. All
contracts that expire in a given month are identical;
each calls for delivery of the same commodity in the
same place at the same time. Forward and spot
contracts, by contrast, call for sale of the
commodity; no one deals "in the contract"; it is not
possible to close a position by buying a traded
offset, because promises are not fungible; delivery is
idiosyncratic rather than centralized.

Id. at 865-866.  A "forward contract" is neither standardized nor

traded on an exchange, and is an individual agreement to buy or

sell some agreed-upon quantity of some commodity at some

agreed-upon price at an agreed-upon time in the future.  CFTC v.

Erskine, 512 F.3d 309, 324 (6th Cir. 2008).

The parties cite many cases about the difficulty of

distinguishing futures contracts and forward contracts, but this

case presents no such difficulties.  What Sprague sold Levco was

not a standardized instrument that could be sold on the commodity

exchange.  Rather, it sold a guaranteed supply of oil for actual

future delivery.  The court does not credit the defendants'

testimony that they believed they were purchasing futures

contracts.  Sprague also did not purchase futures contracts on

Levco's behalf.  Sprague's hedging activities were entirely on its

own behalf and at its own cost.

The defendants next argue that the contract is voidable

because of Sprague's material misrepresentations.  Under New

Hampshire law, "[t]o establish fraud, a plaintiff must prove that

22

the defendant made a representation with knowledge of its falsity or with conscious indifference to its truth with the intention to cause another to rely upon it.  In addition, a plaintiff must demonstrate justifiable reliance." Snierson v. Scruton, 145 N.H. 73, 77 (N.H. 2000)(internal citations omitted).  A cause of action for negligent misrepresentation requires a showing of "negligent misrepresentation of a material fact by the defendant and justifiable reliance by the plaintiff.  It is the duty of one who volunteers information to another not having equal knowledge, with the intention that he [or she] will act upon it, to exercise reasonable care to verify the truth of his [or her] statements before making them." Id. at 78 (internal citations and quotation marks omitted).  New Hampshire's Supreme Court has held that, in the absence of a special duty of disclosure, "silence is not sufficient for misrepresentation." Ingaharro v. Blanchette, 122 N.H. 54, 57 (N.H. 1982).

The defendants claim that Sprague represented that it was buying futures contracts for Levco.  The court has determined, as a matter of fact, that Sprague made no such representations.

The defendants also claim that Sprague's failure to advise Levco that the supply restrictions in place at the Stamford terminal in 2000 or 2001 had subsequently been resolved constituted a misrepresentation that voids the contract.  The court has found, as a factual matter, that Sprague's decision to buy oil using forward contracts was not based on the previous supply problems.

23

The defendants therefore have not shown justifiable reliance. There is also no evidence that Sprague knew of the materiality of this information or otherwise had a duty of disclosure.

The court finds probable cause that the contract between Sprague and Levco is enforceable.  Based on the evidence, the court further finds probable cause that Levco breached the contract.

### 2.   Enforceability of the Liquidated Damages Provision

The defendants next argue that the liquidated damages provision is not enforceable.

> Before a liquidated damages clause will be enforced, three conditions must be met: (1) the damages anticipated as a result of the breach are uncertain in amount or difficult to prove; (2) the parties intended to liquidate damages in advance; and (3) the amount agreed upon must be reasonable and not greatly disproportionate to the presumable loss or injury.

Orr v. Goodwin, 157 N.H. 511, 514 (N.H. 2008).  When interpreting a contract, the court's inquiry focuses on the intent of the contracting parties at the time of the agreement.  R. Zoppo Co. v. Dover, 124 N.H. 666, 671 (N.H. 1984).

The defendants argue, first, that the clause is unenforceable because damages were not uncertain or difficult to prove.  The evidence, however, has amply demonstrated the volatility of the oil market.  Because of the nature of the product and the market, actual damages are difficult to quantify and prove if there is a breach.  Moreover, depending on when the breach occurs, the buyer's obligations might not yet have matured.  Here, for example, Levco breached its obligation to Sprague in November and was

24

contractually obligated to pick up oil throughout the winter. Sprague could not predict in November, when the breach occurred, what the market price for oil would be in January or March. The liquidated damages provision resolves this problem, because Sprague is not obligated to wait for those contracts to mature before determining and proving its damages. Given these realities of the market, the court is persuaded that, at the time the contract was made, damages were uncertain or difficult to prove.[20]

The defendants next argue that the liquidated damages provision is unenforceable because it is unreasonable and disproportionate and does not accurately reflect Sprague's actual lost profits as reflected in the sales differential.

Both parties entered into this contract knowing that the price could change before delivery. That risk was part of their bargain. For years, Levco benefitted from the risk inherent in its contracts. It locked in low summer prices, then sold the oil to its own customers at higher prices in the winter. Each time that happened, Sprague was required by the contract to supply Levco at the low contract price even though the prevailing market price had since gone up.

_____

[20]The defendants argue that damages are not unpredictable because the court can simply look to the price of the futures Sprague sold to determine its real damages. That argument ignores the imperative that the unpredictability of damages must be considered as of the time the contract is made, not in retrospect after a breach. Moreover, as discussed below, the plaintiff's liquidation of its hedge positions does not accurately reflect the lost benefit of its bargain.

25

But when prices fell prior to delivery in 2008, the risk favored Sprague instead of Levco, because Levco had committed to buy its oil at above-market prices.  For Sprague, the benefit of the bargain when prices fall includes profit from having locked in a sale above market price.[21]  This was the bargain the parties struck when they contracted for the sale of a commodity with volatile prices.  The court finds that the liquidated damages provision set forth in Section 13 is a reasonable and proportionate measure of damages that properly reflects the lost benefit of the bargain.

The defendants also argue that the clause is unreasonable in that Sprague, due to its hedging activities, did not actually suffer any damage when Sprague failed to lift.  Sprague's hedging activities protected its sales differential from the risk of rising

---

[21]The liquidated damages provision in the Master Agreement is similar to the measure of damages provided for by the Uniform Commercial Code.  In Trans World Metals, Inc. v. Southwire Co., an aluminum buyer repudiated its installment contract after the price of aluminum fell dramatically, then argued that the UCC measure of damages was far in excess of the seller's actual lost profits.  769 F.2d 902 (2d Cir. 1985).  The Second Circuit rejected the argument, holding that only the difference between the contract price and the market price would award the seller the benefit of its bargain.  Noting that the contract price was fixed months before the anticipated delivery, the court held:

It simply could not have escaped these parties that they were betting on which way aluminum prices would move.  Trans World took the risk that the price would rise; Southwire took the risk that the price would fall.  Under these circumstances, Trans World should not be denied the benefit of its bargain, as reflected by the contract/market price differential.

Trans World Metals, 769 F.2d at 908.

oil prices.  If prices rose, Sprague would be forced to sell oil at below-market prices, but that loss would be offset by its gains on the futures market and it would still be able to count on its sales differential.  Sprague's hedging does nothing, however, to recompense it for the profits it would have made if Levco had performed its obligations under the contract by lifting the oil and paying above-market prices for it.  <u>See, e.g.</u>, <u>Ralston Purina Co.</u> <u>v. McFarland</u>, 550 F.2d 967 (4th Cir. 1977)(upholding exclusion of evidence that Purina hedged on the futures market when it agreed to purchase soybeans, because closing out the hedge did not "cover" the deficiency caused by the supplier's breach, which was a lack of actual soybean delivery).

In light of the foregoing, the court finds there is probable cause that the liquidated damages provision of Section 13 is enforceable.

### 3.   Calculation of Liquidated Damages

The determination that the liquidated damages clause is enforceable does not end the inquiry.  The defendants contend that even if the liquidated damages provision is enforceable, the plaintiff's calculations are not in accordance with the terms of the contract.

The defendants primarily argue that the damages calculation is incorrect because Sprague should have terminated the Master Agreement in early November 2008, when Levco first failed to lift, rather than in January 2009.  Earlier termination, they argue,

27

would have fixed the damages at a lower amount.  The contract does not, however, provide for termination due merely to failure to lift.[22]  The "Event of Default" under the contract was the defendants' failure to provide adequate assurances.  Moreover, the contract does not impose any requirement that the non-defaulting party terminate immediately once a default occurs.  Here, the evidence shows that Sprague was in negotiations with the defendants throughout November, that the actual Event of Default occurred on December 11, when Levco failed to make an adequate assurances deposit, and that the plaintiff waited another few weeks (during the holiday season) before terminating.  It had no contractual obligation to act sooner.[23]

Moreover, even in a down-trending market, oil prices can go up and down daily.  Therefore, the defendants' argument that the damages would have been lower if the termination had occurred "sooner" is entirely speculative, and quite possibly incorrect, without fixing a particular date.

The defendants also argue that the plaintiff has not shown its entitlement to liquidated damages because it has not adequately

---

[22]The defendants make much of Section 11 of the Master Agreement, which relates to the seller's remedies if the buyer fails to lift.  Those remedies do not, however, include terminating the Master Agreement.

[23]The defendants' suggestion that the plaintiff purposely delayed termination in order to increase its damages is unfounded: the plaintiff had no way to predict what the market price would be in the future.

explained how it calculated the market value.[24]  Section 13 requires
the non-defaulting party to calculate the market value in a
"commercially reasonable manner."  The defendants question whether
the values set forth in plaintiff's Exhibit 19 have been fully
explained.

The court notes that, at the hearing and in their papers,
neither side has fully focused its attention on the calculation of
damages.  Certain details have not been explored by either side.
However, at this stage, the plaintiff is not required to prove its
damages with absolute certainty.  The court finds, based on the
current record of evidence adduced at the hearing, that the market
values applied by the plaintiff in calculating its damages were
commercially reasonable as required by Section 13 and that its
calculations of the full damages due under Section 13 have been
adequately explained.

There is probable cause that the liquidated damages provision
is enforceable and that a judgment will be entered against Levco in
an amount equal to or higher than $7,770,458.70, the prejudgment
remedy the plaintiff seeks.

---

[24]The defendants also adopt an argument advanced by Robert
Levene in his testimony, that the liquidated damages calculation
comes to zero because it is to be based on product "remaining to be
purchased" rather than product "remaining to be lifted."  This is
a baseless argument that ignores Levco's contractual obligation to
take delivery of– and pay for– the oil it had ordered, and the
parties' intention that Levco would be invoiced for its oil after
lifting.

B.   <u>Breach of Contract Claims Against Guarantors</u>

The plaintiff alleges that, by failing to pay Levco's obligations, the Guarantors (Edward, Robert, Philip and Sally Levene) breached their guaranties and are liable for the liquidated damages.[25]  The defendants challenge the enforceability of their personal guaranties.

First, they contend that Sally Levene's 1996 guaranty is no longer in force because she terminated it.  The guaranty has no termination provision.

> A guaranty contract is continuing if it contemplates a future course of dealing during an indefinite period or it is intended to cover a series of transactions or a succession of credits, or if its purpose is to give to the principal debtor a standing credit to be used by him from time to time.  An offer for a continuing  guaranty is ordinarily effective until revoked by the guarantor or extinguished by some rule of law.  To revoke a continuing guaranty, the guarantor usually must give notice of the revocation to the creditor.  However, [e]ven a continuing guaranty that is, in terms, unlimited as to duration, imposes liability upon a guarantor only for such period of time as is reasonable in light of all the circumstances of the particular case.  The interpretation of a continuing guaranty, as well as the question of its revocation, ordinarily is a question of fact.

<u>Associated Catalog Merchandisers, Inc. v. Chagnon</u>, 210 Conn. 734, 743 (Conn. 1989)(internal citations and quotation marks omitted).

Based on the evidence at the prejudgment hearing, the court cannot conclude that Sally Levene revoked her 1996 guaranty.   The court has found, as a factual matter, that neither she nor Philip Levene gave Sprague any notice– oral or written– of revocation, and

---

[25]The guaranties do not have a choice of law provision.  The parties appear to be in agreement that Connecticut law governs.

that Sprague continued to rely on the 1996 guaranty.  Even if
Philip Levene did have a conversation with someone at Sprague
indicating that his mother would not submit a new guaranty, that
was not an effective revocation of the 1996 guaranty.  The court
finds that there is probable cause that Sally Levene's 1996
guaranty remained in effect as of 2008.

The Guarantors next argue that their guaranties are limited to
the amount of Levco's credit line.[26]  The plain language of the
guaranties does not support such a reading.  It says that the
guarantors are responsible for all obligations of Levco "existing
or hereafter arising."  The text says nothing about the guaranty
being limited or tied to the credit line.  Further, the defendants'
interpretation is inconsistent with the parties' pattern of
conduct.  Levco regularly ordered far more oil per year than its
credit line would cover.  At most, the credit line limited how much
oil Levco could lift before paying its outstanding invoices; it did
not represent a limit on Levco's obligations to Sprague if Levco
failed to lift oil at all.  The Guarantors, as officers of Levco
involved in its daily operations, were well aware that Levco

---

[26]To the extent that the Guarantors claim their guaranties were
terminated due to a material change in terms (i.e. increases in the
credit line), that argument also fails in light of their status as
officers of Levco and their involvement in its operations.  See,
e.g., 38 Am. Jur. 2d Guaranty §85 ("[w]hen a guarantor consents to
the alteration of the underlying principal obligation, he is not
released by virtue of such alteration").

ordered millions of gallons of oil annually from Sprague[27], which they as guarantors were obligated to pay for if Levco did not.

The court need not linger on the defendants' many other arguments.  They argue that the guaranties lacked consideration because the plaintiff has not shown that it relied on them in agreeing to enter into the Master Agreement in 2005.  This argument fails in the face of the evidence.  Although plaintiff's employees who testified at the hearing might not have been personally aware of the existence of the specific guaranties, they knew that procedures were in place to confirm a customer's creditworthiness. The plaintiff has shown that it relied on the guaranties in continuing to extend credit to Levco.

The defendants also argue that the guaranties were terminated when, after their signing, Levco paid off any then-existing debts to Sprague.  However, the guaranties by their terms extend both to debts existing at the time of their signing and to debts yet to be incurred.

In addition, the defendants contend that the guaranties cannot be enforced until the plaintiff completes legal efforts to collect the funds from Levco, because they are guaranties of collection rather than of payment.

The guaranty of payment binds the guarantor to pay the

---

[27]This case is distinguishable from Monroe Ready Mix Concrete, Inc. v. Westcor Development Corp., 183 Conn. 348 (1981), in that the evidence showed that Levco continuously purchased oil from Sprague through the period at issue.

> debt at maturity in the event the money has not been
> paid by the principal debtor; and upon default by the
> debtor, the obligation of the guarantor becomes fixed
> and the creditor need not make demand on the principal
> debtor.  The guaranty of collection is a promise on the
> part of the guarantor that if the . . . creditor cannot
> collect the claim with due diligence, generally
> following suit against the principal debtor, the
> guarantor will pay the creditor.  The question whether a
> guaranty is one of payment or collection is to be
> resolved by the showing as to the intention of the
> parties.

38 Am. Jur. 2d Guaranty §19; see also Marine Midland Bank, N.A. v.

Elshazly, 753 F. Supp. 20 (D. Conn. 1991); Allen v. Rundle, 50

Conn. 9 (Conn. 1882).  "A guaranty of the payment of an obligation

without words of limitation on condition is construed as an

absolute or unconditional guaranty."  Morrissey v. Ottman, 1 Conn.

Cir. Ct. 140 (Conn. Cir. Ct. 1961).  The Guarantors in this case

agreed to "guaranty the due fulfillment to Sprague . . . of all

obligations of Levco Tech . . ."  (Pl's Exs. 2-5.)  The guaranties

include no words of limitation, and there is nothing in them to

suggest that the Guarantors' obligations were conditioned upon

Sprague first exhausting efforts to collect from Levco.  Therefore,

Sprague is free to seek payment on the guaranties concurrently with

its efforts to collect from Levco.

The court finds there is probable cause that the guaranties

are enforceable and that a judgment will be entered against the

Guarantors in an amount equal to or higher than $7,770,458.70, the

prejudgment remedy the plaintiff seeks.

33

**V.    <u>Conclusion</u>**

In light of the foregoing, the plaintiff's motion for prejudgment remedy (doc. #4) is granted as to defendants Levco, Philip Levene, Sally Levene, Robert Levene and Edward Levene.  The motion is denied as to Doris Levene.

SO ORDERED at Hartford, Connecticut this 11th day of May, 2009.


_____/s/_____
Donna F. Martinez
United States Magistrate Judge